[No. 29401.    *En Banc.*    January 11, 1946.]

CLARENCE J. PETERSON *et al., Respondents,* v. W. J. BETTS
*et al., Appellants.*[1]

[1]Reported in 165 P. (2d) 95.

*John D. MacGillivray,* for appellants Betts.

*Lycette, Diamond & Sylvester* and *Bogle, Bogle & Gates,* for appellant General Petroleum Corporation of California.

*S. J. O'Brien* and *Henderson, Carnahan & Thompson,* for respondents.

ROBINSON, J.—In this opinion, Clarence J. Peterson will be referred to as though he were the only plaintiff and respondent. W. J. Betts, when referred to as defendant or appellant, will be understood to include himself, his wife, and mother; and Petroleum Co. will designate the other defendant-appellant, General Petroleum Corporation of California.

In the court below, a verdict was rendered, and judgment entered thereon, against both defendants, and both have appealed. The case is susceptible of four different dispositions, affirmance as to both defendants, reversal as to both, and affirmance as to Betts and reversal as to the Petroleum Co., or vice versa. The appeal was first heard by a department, and later reheard by the court sitting *En Banc.* This is the third opinion that has been prepared, each by a different member of the court. The record has, therefore, been critically examined in its entirety by three of the judges, and the exhibits and those portions of the oral evidence pointed out by the previous opinions as material to the questions involved have been examined by the other members of the court.

There is, in fact, but little real conflict in the testimony, but there is ample room for divergence of opinion as to its interpretation and legal effect. Although both appellants and respondent have stated at some length the questions involved, the over-all question is whether there was sufficient evidence to warrant a finding of liability as to either of the defendant-appellants.

In determining the question as to each, it will be kept in mind that all evidence favorable to the respondent must

be taken as true, and that he is further entitled to the benefit of all legitimate inferences that may be drawn therefrom.

Clarence Peterson was about forty-three years of age when he received the injuries for which damages are sought. Just prior to his coming to the coast in 1941, he had worked as a carpenter in Chicago for fifteen years. For about a year prior to January, 1943, he was employed by the army engineers, first as a carpenter and then as an inspector of housing and also of trucks and other machinery. He had never worked in the electrical field, other than, as he said, he may have hooked up a Christmas tree or two. During the latter part of 1942, he lived in Redondo for some months.

Appellant Betts owned a building in Redondo, about one hundred feet in length by forty in width. The building faced west. There was a street along its north side. There were living apartments in the rear of the building, and to the westward of these apartments an unoccupied space, referred to as a storeroom, which must not be confused with the space immediately to its westward wherein a general store and gas station were operated. The front of the store was almost wholly plate glass. In front of it, at the edge of the sidewalk, stood an ordinary gasoline pump, under which was a thousand gallon tank. Just to the northward of the pump and under the sidewalk was a concrete vault, about eight or more feet in length, four feet ten inches wide, and four and one-half feet high. The ceiling of the vault was the sidewalk in front of the store. Near the southeast corner of the vault, entrance could be made through a manhole protected by a round iron cover. Just off the northwest corner of the vault there was a little basin or recess, ordinarily covered by a round iron plate about the size of a stove-lid. Upon lifting this, the open end of a one and one-half inch pipe was revealed. It was the fill pipe for the tank, and the gasoline which was poured into it was carried to the tank through a pipe running lengthwise through the vault, a foot or so from the west wall and something less than that from the ceiling.

Mrs. Peterson had worked in the store during a portion of 1942. Early in January, 1943, Peterson proposed to rent

the store and gasoline station from Betts, and also a part of the storeroom back of the store for living quarters. The air compressor stood at that point. It was noisy in operation, the space occupied by it was needed to furnish Peterson living quarters, and the parties mutually agreed that the best place for it would be in the vault under the sidewalk. To make a long story as short as possible, the parties came to terms which they embodied in a written lease of a portion of the building for the term of one year from January 15, 1943. To this written lease was attached, and referred to therein, a supplemental agreement wherein Betts agreed "to remove air compressor from present location in store room to a position under the sidewalk near gas pump and reconnect to air line."

Peterson went into possession on January 15, 1943, and Betts performed the supplemental agreement. With the assistance of Peterson's father-in-law, Betts moved the compressor into the vault in February or March. It was too large to go through the manhole. An excavation was made in the street in front of the building and a hole broken through the west wall of the vault through which the compressor was introduced and connected up, and the vault then restored to its former condition. In moving the compressor, the wiring, switches, etc., were in no way dismantled or disturbed. The wires and switch were simply detached from the outlet in the wall of the storeroom and wrapped around the compressor, and, after it was in the vault, the ends of the wires were connected with electric wiring through an outlet which was already there.

About a month or more thereafter, the respondent secured the postoffice contract at Redondo, to commence April 1st. He needed more room. After several days' negotiations, another written lease was entered into on April 8th, effective as of April 1st. This lease covered all of the building except the rear apartments, and its special provisions and conditions, as distinguished from the usual general provisions, were in almost every way wholly different from those of the first lease, as will be pointed out later in this opinion.

From the first, Peterson had trouble with the compressor unit. The belt by which power was conveyed from the motor to the compressor frequently slipped off. Once he went down and replaced it himself. In order to do so, he shut off the motor by using a switch which was just inside the door of the store. Being a very large man, he had, on that occasion, great difficulty in getting out of the vault. For that reason, on several occasions he had his brother go down and replace the belt. On a number of others, he had Mr. Betts do it. Finally, he complained to Betts of the fact that, when the switch inside the door of the store was thrown, he could not pump gas, and suggested that there ought to be another switch which would turn off the compressor motor only. Betts said there was such a switch just inside the manhole, and the compressor motor could be turned off by reaching in the manhole and pulling a short, dangling wire which he had attached to it.

On July 2, 1943, about four-thirty o'clock, Peterson became aware that the belt had slipped off. He removed the manhole cover, knelt down on the sidewalk, felt around until he found the wire, gave it a jerk, and was immediately thrown up in the air by a terrific explosion in the vault. He was very badly burned and otherwise seriously injured, and was in a hospital for three weeks and confined to his home for five weeks more. Some of his injuries are permanent.

About a half hour before the explosion, a driver for the Petroleum Co., named Matthews, had completed the delivery of five hundred gallons of gasoline into Peterson's nearly empty thousand-gallon tank. In an attempt to determine the cause of the explosion, an electrical expert, a state inspector, was called in. He found the installation of the compressor unit in a vault where gasoline vapor might penetrate, as made by Betts under contract with Peterson, was in violation of the provisions of the Washington electrical safety code for at least four reasons: First, the switch which was just inside the manhole was a wholly unprotected knife switch which was likely to arc and throw a spark; second, there was no guard plate of any kind on the automatic switch on the compressor which would also throw

a spark, or at least might do so; nor were the brushes on the motor covered, and a spark could. be thrown from that source; and lastly, a portion of the wiring was not of the kind required by law in enclosed places which gasoline vapors might penetrate.

The state law prohibits the use of open or unprotected switches in any room where there is a pipe carrying gasoline, because pipes may sometimes leak. As we have already pointed out, the fill pipe carrying the gasoline to the tank ran through the vault. Someone, exactly who is not disclosed by the record, discovered that there was no collar around the fill pipe, and that, if gasoline were spilled during delivery, it could run down into the vault along the pipe. Betts testified that, a half hour or so after the explosion, he detected a little brown trace or stain on the gray cement floor at the end of the vault where the fill pipe entered, which, he thought, looked like gasoline on the floor. He immediately called his wife and had her look at it, and then his son. Both got the same impression, as did a neighbor to whose attention it was also called by Betts immediately after the explosion.

The case was tried on an amended complaint. As against Betts, the particular allegations of negligence were as follows:

"Said wires and equipment was not installed in accordance with recognized and accepted engineering practices or in accordance with the laws of the State of Washington, in the following respects:

"(A) On account of the possible presence of gasoline vapors in this vault, proper and adequate ventilation should have been provided therein so as to prevent the accumulation of such vapors.

"(B) In that there was therein installed loom, BX cable, and lead covered cable without the use of proper terminal fittings.

"(C) In that said knife type switch should have been installed in a metal cabinet and should have been so located as to have been capable of operation without requiring the person desiring to operate it to place his body or any portion thereof in close proximity to this manhole, and should have

been so located so that such person could see said switch when required to operate it.

"(D)  In that said electrical equipment, on account of its close proximity to the pipe which supplied the gasoline tank, and the constant possibility of accumulation of gasoline vapors in said pit, should have been explosion proof, installed in conduit and explosion proof fittings so as to prevent the explosion of said vapors from any electric arcs which might be caused by the various equipment hereinbefore described.

"That neither of the plaintiffs had then or now have any knowledge or information of electricity or the dangers connected with an installation of this character and that at no time were they informed by the defendants that said installation was not in accordance with good engineering practice or that there was any hazard in connection therewith, and that said dangerous condition caused by the action of the said W. J. Betts as aforesaid was latent and could not be discovered by examination except by persons versed in such matters, which the plaintiffs were not."

As against the Petroleum Co., the gist of the allegations of negligence was as follows:

"That pursuant to an order given by the plaintiff Clarence J. Peterson, the Defendant General Petroleum Corporation of California acting by and through its agent or servant O. R. Matthews at about the hour of 4:30 o'clock P. M., on the 2nd day of July, 1943, delivered to the plaintiff five hundred gallons of gasoline which delivery was made by the truck and in the manner heretofore described.  O. R. Matthews placed one end of a hose which ran from said tank truck to the pipe before referred to, in the outer end of said pipe, started the gasoline pump upon his truck and then left the pump in operation for a considerable period of time.  *During this period of time he went into the store of the plaintiffs, where he remained from ten to fifteen minutes, leaving this pumping operation continuing without any supervision. That through the carelessness and negligence of said O. R. Matthews, gasoline was permitted to pass down the outside of said pipe and into the concrete vault hereinbefore described, all this, however, without the knowledge of the plaintiffs.*"  (Italics ours.)

The Petroleum Co. denied that Matthews spilled any gasoline, and affirmatively alleged that Peterson's injuries resulted directly from the negligent manner in which he

kept, used, and maintained his gasoline station.

Betts denied, for lack of information, some of the allegations of the complaint and admitted others, and affirmatively pleaded that Peterson was guilty of contributory negligence, but placed his chief reliance upon the following:

"For Further Answer and By Way of Second Affirmative Defense, these answering defendants allege that in that certain leased contract attached to plaintiff's complaint and marked 'Exhibit B' which was executed on April 8, 1944, the plaintiff, Clarence Peterson, intended to and did waive all claim or cause of action against these answering defendants arising out of any alleged defect in any of the equipment on said leased premises at the time of the execution of said lease and that by reason of such waiver the plaintiff, Clarence J. Peterson, is now barred from maintaining the cause of action herein involved."

There can be no doubt but that the installation and upkeep of the compressor in the manner described was negligent. The state inspector was called as a witness. The substance of his testimony has already been given. His opinion that the installation created a dangerous situation, since it was made in an enclosed place where gasoline fumes might be created, was confirmed by another electrical expert. The Petroleum Co. insists that, as a matter of law, it was negligence *per se* for Peterson, the proprietor of the gas station, to maintain it in the way the evidence shows he maintained it for at least three months prior to his injury, and that the court should have granted its motion to dismiss his action on its plea of contributory negligence. To this respondent's counsel replies that Peterson had no knowledge of any danger or any fact which made it foreseeable.

Putting aside, for the moment at least, the inquiry as to whether the operator of a gasoline station is or is not in law bound to inspect and know the condition of its operating equipment, it seems that there is ample evidence, if believed, (and the jury had a right to believe it), to conclude that Peterson had no actual knowledge of facts which should have enabled him to foresee any danger in the situation. It is true that he had been down in the vault before the accident, and it is further true that, when the manhole cover

was off, it was quite light in the vault; for photographs, which are in the record as exhibits, showing the switches, wiring, fill pipe, etc., in detail, were taken without the use of flashlights or other artificial means. The jury had the right, however, to believe Peterson when he testified as follows:

"Q. Now, while you were down there did you look around at all to see how the pipe went underneath—the fill pipe? A. No, sir. Q. Did you look to see what wires were in there? A. No, sir. Q. Did you observe the switch that was in there? A. No, sir."

And also when he testified:

"Q. Was there any ventilation in that vault to take away gasoline vapors? A. I don't know."

And when asked if he did not know that, if gasoline was spilled around the fill pipe, it would run down into the pit below, he said:

"A. I wouldn't know, I never looked there until the accident happened. Q. Well, practically every time you bought gasoline you went out and watched the man deliver the gasoline, didn't you? A. Yes, sir. Q. Did you mean what you said that you never looked at that before this accident happened? A. I never knew there was an opening around the pipe, no, sir. Q. Didn't you testify under oath here when I took your deposition that you saw gasoline spilled in that hole every time the man delivered gasoline? A. I saw gasoline spilled. Q. Where did you see it spilled? A. I saw it spilled at the insertion from the nozzle of the hose into this pipe. . . . Q. You knew there was a fill pipe that came up there, didn't you? A. Yes, sir. Q. And you knew there was not anything around the fill pipe, didn't you? A. No, sir. Q. Well, by looking at it you could see that, couldn't you, that there wasn't anything tight around the fill pipe that made a tight joint? A. In the month of August I did see it. Q. Well, by looking at it, if any one looked at that fill pipe would they not see that there was a hole around the fill pipe? A. Not necessarily."

The jury further had the right to believe him when he testified that, although he saw no gasoline spilled on the date of the accident, the driver of the oil truck spilled gasoline on

practically every previous delivery, and, when asked what became of it, he testified:

"Q. So that you knew in following the pipe down there, the only place where it could go was down in the vault? A. Well, I did not know at that time. I know now. I did not know where it went at that time. I knew it was gasoline. Q. Well, you knew the pipe went down into the vault? A. I did not know until after I got out of the hospital, where it went. . . . Q. As I get it then, you did not know where this gas was disappearing to, and you did not care? A. That is right. Q. You made no investigation? A. That is right."

The jury further had the right to believe him when he said he did not know that the fill pipe ran through the vault or where the one thousand gallon tank was situated with reference thereto; and further, that he did not see the compressor unit installed, or even see it moved, although he saw the big pile of dirt in the street, which had been excavated in order to knock a hole in the west wall to get the compressor, its switches, connecting wiring, and other appurtenances into the vault. His testimony as to these matters, is, in part, as follows:

"Q. Now, then you saw them take the motor and compressor out of the back of the store and move them out, did you not? A. No. Q. You did not see them do that at all? A. No. Q. You were not working any place else during this time? A. No, sir. Q. You were at the store all the time; the front of that store, which looks out upon the sidewalk is chiefly a large glass window, is it not? A. That is right. Q. You did see them out in the street excavating— just assume this is the sidewalk and the vault is underneath, you saw them out there excavating in the street. A. Yes. Q. You couldn't help but see them if you looked out the window from your store? A. That is right. Q. Any time you went out to serve any one gasoline, you would have to be right by that pit, would you not? A. That is right. Q. You know that the air compressor and motor were put into that vault by digging a hole in the street and putting them through that way, do you not? A. Yes, sir, I know by the testimony that is the way it was put in there. I did not see it moved. I heard testimony it would not go through the manhole. . . . Q. You mean that you did not ever see that go in under the sidewalk, then? A. No. Q. Nobody

told you out there how they put it under? A. No, sir. Q. Mr. Betts lives right there, does he not, too, right close by? A. Yes, sir. Q. And with Mr. Betts living close by and your father-in-law and the other people there, they come in and out of the store all the time, don't they? A. Yes, sir. Q. And you neither saw them nor were told at the time how that thing was put in there? A. No, sir. Q. How long did it take them to do it, to dig that hole? A. I don't know, sir. Q. Well, didn't it excite your curiosity as to why they were digging a hole in front of your store that you had leased? A. Not a bit. It was a cold day and I did not want to get out there. Q. You never—did any one come to buy gasoline while you were there? A. Yes. Q. Well, when they came by to buy gasoline you went out into the street? A. I went out on the sidewalk. Q. Well, now, the pump that you served the gasoline with was right alongside of the hole? A. Yes, sir, except for a lot of dirt that was piled up there. Q. Well, the dirt was at the side of the hole, was it? A. I don't know. Q. Well, didn't you look at all at that time to see anything that was happening there? A. I saw my stepfather out there with a shovel. Q. You say you don't know anything then about how it went in? A. No, sir. Q. Well, now, after the thing had gone in there, didn't you look in the hole from the street side? A. No, sir. . . . Q. Well, then, you did not look in the opening that was made in the side of the—in the street there going into this vault in front of this store at all? A. No, sir. Q. Now, who put the wires in there? A. I don't know. Q. In your complaint you said Mr. Betts did, didn't you? A. Well, he— MR. THOMPSON: I object to that as not proper cross-examination. The complaint may be based on information. It does not have to be based on personal knowledge. THE COURT: You may answer. A. I don't know who put the wires in. . . . Q. Did Mr. Betts tell you anything about what he was doing while he was doing the work? A. Not that I can recall. Q. Did your stepfather tell you anything about what was going on in that pit while the work was going on? A. No, sir. Q. Did Mr. Betts' son who was there, tell you anything about it? A. No, sir. Q. Well, did you inquire from anybody what was going on in the sidewalk under the store you had under lease? A. No, sir."

The jury could find from the evidence that Peterson was not much interested in the equipment of the station. He testified that, one day while the excavation was still in the

street, Harris, another driver of the Petroleum Co., was making a delivery of gasoline, and, while doing so, said to Betts that he thought the fill pipe was too small; "it takes too long to unload a load."

· "Q. Then, you say Mr. Betts took a look? A. Yes, he did. Q. Where did he take a look? A. Down in the hole. Q. Did he look through the manhole cover or through the place that was torn out? A. He went over to the place that was torn out. Q. You did not follow him over and have a look for yourself. A. No, sir. Q. Then he came back and said for some reason it was too much trouble, or for one reason or another he could not put another pipe in? A. For some reason, I don't know what it was. Q. And you stood there and heard him say it? A. Yes, sir. Q. Weren't you the man that was going to operate it, and the man who was going to continue to operate it, weren't you in the least bit interested in the size of the pipe that was going to go down there? A. Not at all, sir."

All of this testimony laid the foundation for the following questions asked Peterson by his counsel in closing his redirect examination:

"Q. Did you have any knowledge whatsoever that there was any danger in this situation? A. Certainly not. Q. On July 2nd, 1943, when you stuck your left arm in there and pulled that switch? A. No, sir."

■ It is said, in 1 Shearman and Redfield on Negligence (1941) (rev. ed.) 50, § 24:

"Foresight, not retrospect, is the standard of diligence. It is nearly always easy, after an accident has happened, to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence. It is always a question of what reasonably prudent men under the same circumstances would or should, in the exercise of reasonable care, have anticipated."

Since actual negligence necessarily includes the element of reasonable anticipation that some injury may result from the act, and Peterson's testimony was to the effect that he knew none of the facts that should have induced him to anticipate danger, and the jury had the right to believe his testimony, its finding that he was not guilty of contributory negligence is understandable.

We do not find it necessary to discuss the question raised by the plausible argument of the appellant Petroleum Co., to the effect that Peterson, as a proprietor of the gas station, was, in law, bound to know the condition of the equipment used in serving the public, and that his failure to inspect was in and of itself contributory negligence; for we are of the opinion that application of the same foreseeability rule employed to defend against the Petroleum Co.'s plea of contributory negligence shows that there was a complete lack of evidence in the case to warrant a finding of primary negligence on the part of the Petroleum Co.

There is no evidence that Matthews spilled any gasoline on the day of the explosion. He testified that he did not, and Peterson himself testified that he saw none spilled on that day. He was present when the oil truck arrived to make the delivery, and for some minutes (Matthews says, eight or ten) stood watching the operation. Later, both men went into the store to adjust the accounts, leaving the gasoline running through the hose and into the fill pipe. It was the plaintiff's theory that gasoline was spilled while they were in the store, because the pump in the truck delivered the gasoline through the one and one-quarter inch nozzle into the inch and a half fill pipe with such force that gasoline was forced out between the nozzle and the fill pipe. In support of this theory, he testified that he could hear the pump running all the time he was in the store. But it was later conclusively shown that there was no gasoline pump whatever on the truck. The only force behind the gasoline was the force of gravity, and, since the truck held but six hundred gallons, that force could not have been very great; and whatever it was, it was certainly at its peak during the first few minutes of the delivery and progressively diminished as the level of the gasoline lowered in the tank. Yet, Peterson says that he saw no spillage during the first eight or ten minutes.

The driver testified that he had operated the delivery truck for three years, and it was his invariable custom that, when the amount to be delivered had run through the meter, to then cut the flow, detach the hose from the truck, and

hold the outer end up until all gasoline had drained out of it into the fill pipe, and then to remove the nozzle from the pipe. He acknowledged that it would be possible to spill a small quantity by removing the nozzle from the pipe before the hose, which appears to have been less than six feet in length, had completely drained, but categorically denied that any such thing happened.

Since there is no testimony of any spillage, a finding that any gasoline was spilled can only be arrived at by what the respondent would call logical deduction, and the appellant Petroleum Co. calls "guess and speculation." That the explosion was an explosion of gasoline vapor, is sufficiently certain. It could not have been anything else. There is testimony by three members of the Betts family and a neighbor who lived in the vicinity that, after the explosion, the floor of the vault, at a point near where the fill pipe entered, looked slightly damp and of a slightly darker color than the rest of the floor. It was their deduction that this was caused by gasoline which had in some way gotten into the vault. There was evidence also that, if gasoline was spilled around the fill pipe intake, it could follow the pipe into that end of the vault. It is not disputed that the explosion occurred about a half hour after the delivery.

In respondent's brief, another circumstance is urged, as bearing on this phase of the matter:

"There is also one other very significant factor. O. R. Matthews testified that after the accident a coupling device was either put on to the end of the fill pipe or on to the nozzle. Peterson testified he did not do this. We placed Mr. Harris, the Auburn manager of the appellant's business, upon the stand and inquired whether this apparatus had been installed by the Oil Company. The court sustained an objection to the question. *However, we think it is a fair inference that this new device was installed by the appellant Oil Company, since everybody admits that it was installed, and appellant refused to allow us to ask its agents anything concerning this.*" (Italics ours.)

This is an illustration of the care which should be exercised in relying on inferences. While appearing fair, the inference is unsound. When making that statement in his

brief, counsel no doubt had forgotten that, in his redirect examination of Betts, he elicited the following answer:

"A.   It was a tin can that fit snugly over the pipe and they have made statements there was never a cap or any cover over that, and there was one to begin with, and *after the explosion when I found out there was none there, instead of putting another can over it, I had a pipe fitting and a plug that I put over the top.*"   (Italics ours.)

That Matthews spilled gasoline around the intake pipe, can only be found by inference from other circumstances. The record, however, suggests no other way in which the gasoline could have gotten into the vault, except by leakage from the pipe itself, and that it may have gotten entrance in that way is, to some extent, rebutted by the testimony of Betts that the pipes were installed in 1935; that he had dismantled a portion of them a year or two before the explosion; and that the joints were tight at that time.

◼ In a civil case, it is not required that liability be proven beyond a reasonable doubt; and even in criminal cases valid conclusions may be arrived at from circumstantial evidence. The circumstances relied on in this case are consistent with each other, and we will assume that the jury could conclude that Matthews spilled some gasoline.   The jury was not required to accept his denials, and for that matter it is not impossible that the spillage occurred without his noticing it.

◼ That a mixture of gasoline vapor and air is highly explosive in an enclosed place is a matter of common knowledge.   Automobiles are propelled by such explosions.   It has been held, in many cases, that danger should be foreseeable if gasoline is spilled near an open flame.   In *Gust v. Muskegon Co-operative Oil Co.*, 226 Mich. 532, 198 N. W. 175, 33 A. L. R. 772, the plaintiff was riding in the front seat of an automobile with a lighted kerosene lantern at her feet. She stopped at defendant's station for gasoline.   The fill pipe was in the cowl, and inside of the windshield, in close proximity to the lighted lantern, of the presence of which the station agent was aware.   He spilled gasoline on the woman's clothing.   A fire resulted, in which plaintiff was severely burned.   He was found negligent, but the plaintiff's

action was dismissed on the ground that she was contributorily negligent. It was held that both parties should have foreseen the danger of handling gasoline near a flame.

In *Nick v. Standard Oil Co.,* 183 Minn. 573, 237 N. W. 607, a similar result was reached where the vehicle being supplied with gasoline was a popcorn wagon with two unprotected gas flames burning. But we have found no case in which the spillage of a small amount of gasoline out in the open air, as in this case (assuming, *arguendo,* that gasoline was in fact spilled), has been held to be in and of itself negligence.

We think the case for the respondent as against the Petroleum Co. was stated, as strongly as it can be put, in one of the conflicting opinions prepared after the departmental hearing. It was therein said that the verdict of the jury as against the Petroleum Co. could be approved on the following theory:

"While the compressor was being installed, a representative of the corporation made a delivery of gasoline. The excavation and the hole in the wall of the vault were open. The driver suggested to Betts that a larger pipe should be installed so that the gasoline could be delivered from the delivery truck to the gasoline tank. Just what knowledge he gained as to the location of the pipe on this occasion or what the other representative of the corporation who also delivered gasoline had learned or knew as to where the gasoline might go if it was allowed to overflow or be spilled into the basin, must be left to inference; but the jury must have concluded that the corporation acquired the knowledge, or should have known and realized, that such gasoline would in all probability reach the vault and that there would be a resultant hazard."

It will be noted that, in the above analysis of the question, it is conceded that "the jury must have concluded that the corporation acquired the knowledge, or should have known and realized, that such gasoline would in all probability reach the vault and that there would be a resultant hazard." We agree that such a finding was necessary in order to render a verdict against the corporation. We are, however, unable to agree that the jury could reach such a conclusion by any process of inference.

■■ An inference is a logical deduction or conclusion from an established fact. The mental process is: Since this is so, it must follow that it is also true, etc. There is no evidence in the record which tends to prove that, prior to the explosion, Matthews, or for that matter anyone else, knew that gasoline spilled around the intake pipe would, or could, run down into the vault. It will be recalled that even Peterson, who had operated the station for six months, did not know that. Furthermore, while it can be fairly inferred that Matthews knew that there was a compressor in the vault, there is no evidence in the record that he knew the particulars of its installation, that is, the illegal wiring, the unprotected battery brush, the unguarded automatic switch, and the naked knife switch. It is suggested only that the jury could infer that Harris, another employee of the company, did know these things, and his knowledge could be imputed to Matthews, or at least to the Petroleum Co. Harris delivered gasoline one day while there was an excavation in the street alongside the vault, and a hole in the cement wall through which the compressor was at some time or another introduced therein. Peterson was out on the sidewalk watching the delivery. Betts was also there. Peterson testified that Harris told Betts that he ought to install a larger fill pipe. Peterson further testified as follows:

"Q. Then, you say Mr. Betts took a look? A. Yes, he did. Q. Where did he take a look? A. Down in the hole. Q. Did he look through the manhole cover or through the place that was torn out? A. He went over to the place that was torn out. Q. You did not follow him over and have a look for yourself? A. No, sir. Q. Then he came back and said for some reason it was too much trouble, or for one reason or another he could not put another pipe in? A. For some reason, I don't know what it was. Q. And you stood there and heard him say it? A. Yes, sir. Q. Weren't you the man that was going to operate it, and the man who was going to continue to operate it, weren't you in the least bit interested in the size of the pipe that was going to go down there? A. Not at all, sir."

It will be noted that it was Betts, not Harris, who went down into the excavation and looked into the vault. No rea-

son appears or is suggested why Harris should go down and look in the hole. He was interested only in the diameter of the fill pipe, and he knew all there was to know about that, he having just poured, or possibly at the very moment was still pouring, gasoline into it. Furthermore, that no valid inference could be made to the effect that Harris learned the facts about the compressor unit at that time, is absolutely established by the further circumstance that there is no evidence whatsoever that the compressor was then in the vault. For all that appears, it was still standing in the storeroom back of the store.

■ It is said, however, that the jury could have found that the corporation acquired the knowledge, "or should have known and realized," etc. If it is meant by this that it was the corporation's duty to inspect the premises before making delivery of gasoline, the answer is, it had no such duty.

"Generally speaking, no duty rests, on a person who delivers gasoline, to inspect the premises where a storage tank is located before making delivery to the place provided for that purpose; hence appellee's employee was under no duty to inspect the premises where this storage tank was located before making delivery." *Fritsch v. Atlantic Refining Co.,* 307 Pa. 71, 160 Atl. 699.

"The rule is, that where one furnishing bulk products does not install the receptacle for those products, or the pipes connecting such receptacle with the source of supply necessary to fill them, and does not own or have control over them, he is not responsible for their condition or their maintenance and cannot be held liable for injuries caused by an accident arising out of a defective condition of such receptacle or its equipment, in the absence of knowledge of such defect." *Allegretti v. Murphy-Miles Oil Co.,* 363 Ill. 137, 142, 1 N. E. (2d) 389.

As to the liability of Betts, the controversy in this court is largely centered upon the question as to whether, at the time of the explosion, July 2, 1943, Peterson held the premises under a lease executed on April 8, 1943, but effective as of April 1st, or under the lease executed in January, 1943. The April lease does not, in its terms, purport to be a modi-

fication of the January lease. It in no way refers to the January lease, and is in and of itself a complete instrument. All italics in the following quotations from these instruments are supplied.

In the January instrument, the property leased is described as follows:

"The Westerly (front) half of one-story building, situate at the South East corner of Beach Drive and Canyon Road, in Redondo Beach Park, formerly part of Houchen's Market, with the appurtenances as are now therein the above described part of building, *and in such condition as is of this date*. Certain changes of re-modeling, to be done by Lessors as per separate agreement, attached hereto."

Attached to the lease is a paper, signed by both parties, reading, in part, as follows:

"RE-MODELING OF STORE AND APARTMENT.
"Lessors agree to remove air compressor from present location in store room to a position under the sidewalk near gas pump and reconnect to air line."
(This is followed by a paragraph setting out specifications of certain changes to be made in the interior of the building.)

In the April lease, the property devised was described as follows:

"*All* of the one-story Stucco store building, situate at the South east corner of Beach Drive and Canyon Road, in Redondo Beach Park, *with the appurtenances now therein and in the condition as is of this date,* except the back apartments, formerly used for living quarters for those operating the store."

The term of the January lease was fixed as follows:

"For the term of one year from the 15th day of January, 1943 to the 15th day of January, 1944."

And of the April lease as follows:

"For the term of one year from the first day of April, 1943, to the first day of April, 1944."

The January lease contained the following rental provision:

"Now THEREFORE, in consideration thereof the Lessee herein mentioned hereby covenants and agrees to and with

the Lessors herein, that they the said Lessees will diligently and in a business like manner carry on the retail business at the above named location in Redondo, and will pay the Lessors, as rental for said premises, monthly beginning January 15th, 1943, and monthly thereafter on the 15th day of each and every month, the sum of ($55.) fifty five dollars, which will include the use of water and electricity for the carrying on of a retail merchandise store of the nature as has been during the past year. Said water and electricity to be used conservatively and not wasted. An additional 3% will be paid as rent on amounts over $2,000 gross per month."

The April lease contained the following very different rental provision:

"Now THEREFORE, in consideration thereof the Lessee herein mentioned hereby covenants and agrees to and with the said Lessors herein, that they, the said Lessees, will diligently and in a business like manner carry on the retail business at the above named location and will pay the said Lessors as rental for said premises, monthly, beginning May 1st, 1943, (3%) three per cent of the entire gross sales from all merchandise and sales transacted thru the operation of said business, including 3% of whatever remuneration received from the operation of Post Office, telephone, pinball games, etc. for the previous months business."

The January lease contained the following specific agreement:

"IT IS AGREED THAT said Lessees shall pay all licenses, permits, etc., necessary to the proper conduct of said retail business, in compliance with all local, County, State and Federal laws and rulings. Lessors not to be responsible for any loss or damage to merchandise or persons, if for any reason equipment should fail to function properly at any time. Lessors not to be responsible for upkeep or operation, or replacement of said equipment."

The April lease contained a similar agreement, with some additions:

"IT IS AGREED THAT, said Lessee shall pay all licenses, permits, *light and water bills for the entire building,* including the rear apartments, above described (Lessors to have privilege of renting and retaining the revenue from said rear apartments). Lessors not to be responsible for any loss or damage to merchandise or persons, or for any reason any

of the equipment should fail to function properly at any time. Lessors not to be responsible for upkeep, *repair,* operation or re-placement of any equipment."

It has been suggested that the question whether the instrument executed in April was a new lease or merely a modification of the January lease is to be resolved by ascertaining the intention of the parties; in other words, that it is a factual question, and it is further urged that it must be presumed that all factual issues were settled by the jury's verdict. But if it be a factual question, there is no oral evidence as to the intent of the parties, and the intent must be deduced from the written instruments.

The April lease is for enlarged premises, for an enlarged term, for a very different rental, and whereas the January lease provided for certain alterations, the April lease did not, but, on the other hand, specifically provided that the lessor should not be responsible for repairs. It then went on and repeated, word for word, all the general provisions of the January lease, such as guaranteeing the lessee first chance of a further lease, the first option to buy in case of sale, the right of lessor to re-enter in case of lessee's failure to pay rent, covenant against assignment or subletting without lessor's written consent, and lessee's covenant to surrender the premises upon the expiration of the lease in as good repair as they are now, any ordinary wear and tear and damages by fire excepted. In other words, it was in every way a complete lease, effective as of April 1st, and lessor accepted the premises "in the condition as is of this date." That date, it seems to us, can only be taken to be April 1st.

But what the parties intended in this respect was not a question for the jury, nor is it open to the court to speculate as to their intent. The instrument being a complete lease, the law says that it superseded the January lease, and, although there was no physical surrender of the premises covered by that lease, that there was, nevertheless, in law, a surrender and a new entry on April 1st.

"The term surrender by operation of law is properly applied to cases where the owner of a particular estate has been a party to some act the validity of which he is by law after-

wards estopped from disputing, and which would not be valid if his particular estate continued to exist. Thus, where a lessee for years accepts a new lease from the reversioner, he is estopped from saying that his lessor had no power to make such a lease; and as the lessor cannot grant a new lease until the prior one has been surrendered, the acceptance of the new lease necessarily implies a surrender of the former one. Such a surrender is an act of law, and takes place independently of the intention of the parties." 2 Taylor, Landlord and Tenant (9th ed.) 101, § 507.

"If the tenant accepts from the landlord a new lease, to take effect during the continuance of the interest created by the previous lease, this is regarded as effecting a surrender by operation of law on the theory that, by the acceptance of the new lease, the tenant becomes a party to an act the validity of which he is estopped to dispute, but which cannot be valid if the estate created by the first lease continues to exist." 2 Tiffany, Landlord and Tenant 1323, § 190.

The following authorities support these statements: 3 Thompson on Real Property (Perm. ed.) 759, § 1495; 32 Am. Jur. 769, Landlord and Tenant, § 910; *Diamanti v. Aubert*, 68 Utah 582, 251 Pac. 373; *Casper Nat. Bank v. Curry*, 51 Wyo. 284, 65 P. (2d) 1116, 110 A. L. R. 360; *Herboth v. American Radiator Co.*, 145 Mo. App. 484, 123 S. W. 533; *Enyeart v. Davis*, 17 Neb. 228, 22 N. W. 449; *Fernschild v. Brown*, 255 App. Div. 983, 8 N. Y. S. (2d) 278; *Evans v. McKanna*, 89 Iowa 362, 56 N. W. 527. See, also, *R. C. H. Covington Co. v. Masonic Temple Co.*, 176 Ky. 729, 197 S. W. 420, L. R. A. 1918A, 436.

This, then, is not a case where the landlord "agreed to put and keep the premises in repair," as in *Mesher v. Osborne*, 75 Wash. 439, 134 Pac. 1092, 48 L. R. A. (N. S.) 917, and in *McCourtie v. Bayton*, 159 Wash. 418, 294 Pac. 238, upon which decisions the respondent chiefly relies. That there may be no doubt as to the rationale of these decisions, we quote briefly from the opinion in the *McCourtie* case:

"It *is* also settled in this state that, if the landlord agrees or assumes to make repairs on the rented premises, he is liable for negligence in so doing. *Mesher v. Osborne*, 75 Wash. 439, 134 Pac. 1092, 48 L. R. A. (N. S.) 917."

The lease under which respondent held, on the date of the explosion, contained no provision to make repairs, but, on the contrary, the lessee had accepted the premises, "with the appurtenances now therein and in the condition as is of this date," and with the following stipulation in the contract: "Lessors not to be responsible for upkeep, repair, operation or re-placement of any equipment."

It is said in the opinion in the *Mesher* case, *supra,* and in many subsequent opinions which could be cited, if necessary:

"It is a general principle that, in the absence of express contract to the contrary, a tenant takes the demised premises as he finds them and there is no implied warranty by the landlord that they are safe or fit for the purpose for which they are hired. The maxim *caveat emptor* applies. 3 Shearman & Redfield, Negligence (6th ed.), § 709; *Baker v. Moeller, supra* [52 Wash. 605, 101 Pac. 231.]"

It is also said in the opinion in the *Mesher* case:

"To the general rule of the landlord's nonliability for injury from defects, there is the well recognized exception that, even in the absence of warranty or express agreement by the landlord to repair, he is liable to the tenant or the tenant's guest as for a tort, where, with actual knowledge of obscure defects or dangers at the time of the letting, he lets the premises without disclosing such defects to a tenant who does not know, and by the exercise of reasonable care would not discover, them. The duty to disclose such latent defects and dangers when actually known to the landlord exists without regard to any covenant or lack of covenant to repair. But in the absence of such covenant, there is no duty of inspection on the landlord's part to discover latent and unknown defects."

In his pleadings, the respondent sought to bring the matter within this exception, but the evidence in the case showed no latent defect in the compressor or its appurtenances. The defect was purely one of its location. Of its location, respondent knew from the first, for he had agreed in January that it should be located in the vault. On April 1st, when he accepted the premises "in the condition as is of this date," it was there; and by July 2nd, when the explosion occurred, it had been operated under his sole control for nearly three

months at least. Whatever danger there was, was not latent or concealed, but entirely open. He testifies that he did not know of any danger and fortifies that testimony by adding that he never saw the installation. This is very like the contention frequently made, but never accepted, that one is not bound by a contract which he signed without reading, or by one which he read but could not understand.

On the appeal, however, the respondent does not appear to rely upon the latent defect exception, but rather upon what he treats as another exception to the general non-liability rule. It is said in the respondent's brief:

"In truth this was not a latent defect but was a mechanical device which had been improperly installed by the landlord. The *Toole* case applies to such cases a different rule of liability. . . .

"'This court appears in this decision [*Toole v. Franklin Inv. Co.,* 158 Wash. 696, 291 Pac. 1101] to have made mechanical devices an exception to the general rule and to have imposed upon the landlord, even without express contract, the duty of warning the tenant of defective mechanical devices and of keeping such devices in repair.

"It is submitted that the present case comes well within the scope of the *Toole* case."

The length to which this opinion has grown precludes an adequate discussion of the *Toole* case. We think, however, that the quotation of two sentences from the opinion will be sufficient to show that the contention that this case comes within its scope is untenable.

"But here is a mechanical device regarding which the tenant knew nothing and could learn nothing by ordinary inspection. . . . Janitor service was furnished, and, while, by the terms of the lease, that did not include inspection and repairs to the bed, yet there is enough in the evidence to warrant a jury in finding that it was the duty of the janitor to keep the beds in good working order."

Janitor service was furnished, and the jury was warranted in finding that it was the duty of the janitor to keep the beds in good working order. This is but an application of the repair exception developed and applied in *Mesher v. Osborne.* The *Toole* case can have no applicability to a case

where, as here, the lease contract contains the following provisions:

"Lessors not to be responsible for any loss or damage to merchandise or persons, or for any reason any of the equipment should fail to function properly at any time. Lessors not to be responsible for upkeep, repair, operation or replacement of any equipment."

For the foregoing reasons, the judgment appealed from will be reversed in its entirety, and the cause dismissed.

BEALS, MILLARD, STEINERT, BLAKE, SIMPSON, JEFFERS, and MALLERY, JJ., concur.

DRIVER, C. J., did not participate.

February 23, 1946. Petition for rehearing denied.

