[No. 29843. Department One. July 12, 1946.]

A. D. WINSOR, *as Administrator, Appellant,* v. SMART'S AUTO FREIGHT COMPANY, *Respondent.*[1]

[1]Reported in 171 P. (2d) 251.

*Henry W. Parrott* and *Hyland, Elvidge & Alvord,* for appellant.

*Ballinger, Hutson & Truscott,* for respondent.

MALLERY, J.—The plaintiff, A. D. Winsor, suing as administrator, brought this action to recover damages for the wrongful death of the decedent, James Reid. The cause was dismissed with prejudice upon a challenge to the sufficiency of the evidence. Plaintiff appeals.

A challenge to the sufficiency of the evidence admits the truth of the appellant's evidence and its reasonable inferences and requires that the evidence be interpreted in the light most favorable to the appellant. *Billingsley v. Rovig-Temple Co.,* 16 Wn. (2d) 202, 133 P. (2d) 265.

The evidence, so construed, showed that on October 27, 1943, James Reid, age fifty-six and in good health, was crushed to death between a truck and trailer which he was attempting to couple. This automotive equipment, owned and operated by the respondent, was among the largest used by carriers in interstate motor transport. The truck is about eighteen feet long by ten feet high by seven and a half feet wide, having a cargo carrying capacity of six tons. Almost identical with the truck in its other dimensions, the trailer is twenty-four feet long and carries a proportionally larger load. The two vehicles are coupled together by means of a steel tongue, five feet eight inches in length, attached to the trailer at one end and having a ring on the other end. Mounted on the rear axle of the truck is a hook, over which the ring is passed and there secured in place. The tongue weighs from three to four hundred pounds, but when disconnected from the hook is held up by spring tension so that one man can effect the coupling.

The accident which resulted in Mr. Reid's death occurred during his first working day as a civil service employee at the Sand Point naval air station in King county. Sometime during the forenoon of that day, the respondent's truck and

trailer arrived at the air station to be loaded with material destined for an aircraft carrier at Astoria, Oregon. The driver, Jones, backed the trailer against the loading platform of the main warehouse, disconnected the truck, and then, so that it, too, could be loaded, backed the truck to the platform in a position parallel to and to the right of the trailer.

Assigned to a working party under the superintendence of a Mr. Lipes, the decedent's duties were to assist in the loading and unloading of trucks and railroad cars. During the forenoon, he was so employed in loading the respondent's truck. At eleven-thirty, Mr. Lipes' crew suspended operations for lunch, returning to the job at twelve noon. The decedent, however, being a new employee, was required to attend an orientation meeting elsewhere on the station. Sometime after one-thirty p. m., the respondent's truck being loaded, and the load having been secured, plans were made for its departure. Jones' helper or swamper was sent to the station office to obtain clearance papers, and Jones, being alone with Lipes, asked him to render aid in connecting the truck and trailer. The decedent had not at that time returned from his meeting and did not reappear upon the scene until Lipes was in the act of coupling the vans.

In order to bring the truck into position, it was necessary to back down a slight incline, about three feet of rise in forty feet of distance, caused by the high crown of the street in front of the warehouse. Prior to driving his truck out from the platform, Jones built up the amount of air pressure necessary for the operation of his brakes. He then pulled up to a position ahead of the trailer, the front wheels of which were headed from ten to fifteen degrees to the right of its longitudinal axis. Lipes took a position to the left and just ahead of the trailer. Jones shifted into his slowest reverse gear and, by releasing his brake sufficiently, eased very slowly down the incline toward the trailer as Lipes guided him by means of hand signals. As Jones neared the hookup point, Lipes signaled him to halt, then stepped up to the cab of the truck and cautioned Jones to "take it back very easy," and "You got about six inches more to go." Lipes then

stepped in between the truck and trailer, on the left side of the trailer tongue, and raised it twelve to fourteen inches so that it would correspond in height to the coupling hook. Mr. Lipes testified:

"I stepped in back [of the truck] and I couldn't see him [Jones] any more, and I was going to raise the tongue to hook up. . . . Reid came in from the opposite side on the closed corner of the truck and trailer. I didn't know he was there. I hollered for the driver to stop. I just missed the hookup a quarter of an inch; and I hollered for Reid to get out, and I hollered for the truck driver to stop; but on account of the diesel motor and exhaust over the cab he didn't hear me. He gradually came down and just very slowly pinned Mr. Reid about in this angle and slowly come back a little and got him straight like this, the truck in front and the trailer in back. I then run around to the driver and told him to pull out; that he had a man pinned."

Lipes testified further that, after he had raised the tongue, the decedent took hold of it, that the tongue bounded over the hook which was mounted on the rear axle of the truck and lodged against the back end of the truck on the spring works, that Jones had backed approximately nine inches beyond the estimated six inches to the hook-up point, that the truck could not have come back more than two feet without bumping its right rear corner against the trailer, which it did not. Both Lipes and Jones had qualified themselves as expert truck drivers of many years experience. Both testified that, from the cab, it would be impossible to see into the opening, and that, sitting in the cab of trucks of that size, it is impossible to estimate six inches of reverse travel.

The appellant has assigned error upon the granting of respondent's nonsuit.

■ Respondent's motion raises the issue whether, upon the evidence adduced, the appellant was entitled to have his case submitted to the jury.

"Upon a motion for a nonsuit, there is presented only an issue of law. A motion for a nonsuit admits the truth of the plaintiff's evidence, and of every inference of fact that can be legitimately drawn therefrom, but denies its sufficiency in law. So, it is for the trial judge, when requested to non-

suit, to say whether any facts have been established by evidence from which negligence *may be* reasonably inferred. If not, there is no case to go to a jury. But if from facts established negligence may reasonably and legitimately be inferred, it is for the jury to say whether from those facts negligence *ought to be* inferred." 1 Shearman & Redfield on Negligence 113, § 42.

The appellant argues that negligence is to be found in the act of the truck driver backing up at least three or four feet after the hook-up point had been reached, knowing that someone had to be between the truck and the trailer to hold up the tongue. If it be conceded that the truck were backed four feet beyond that point, and this fact is not supported by the evidence, still there is no showing that the driver, Jones, knew or had reason to know of the presence of the decedent between his truck and trailer.

It is said in 1 Shearman & Redfield on Negligence 50, § 24, that

"Foresight, not retrospect, is the standard of diligence. It is nearly always easy, after an accident has happened, to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence. It is always a question of what reasonably prudent men under the same circumstances would or should, in the exercise of reasonable care, have anticipated."

The above language was quoted with approval in the recent case of *Peterson v. Betts*, 24 Wn. (2d) 376, 165 P. (2d) 95, wherein it was held that:

"Since actual negligence necessarily includes the element of reasonable anticipation that some injury may result from the act, and Peterson's testimony was to the effect that he knew none of the facts that should have induced him to anticipate danger, and the jury had the right to believe his testimony, its finding that he was not guilty of contributory negligence is understandable."

The matter of the actor's knowledge of danger as a factor in the determination of a standard of reasonable conduct is discussed in 2 Restatement of the Law, Torts, 762, § 289, wherein it is said:

"The actor should recognize that his conduct involves a risk of causing an invasion of another's interest, if a person,

(a) possessing such perception of the surrounding circumstances as a reasonable man would have, or such superior perception as the actor himself has, and

(b) possessing such knowledge of other pertinent matters as a reasonable man would have or such superior knowledge as the actor himself has, and

(c) correlating such perception and knowledge with reasonable intelligence and judgment would infer that the act creates an appreciable chance of causing such invasion.

"*Comment: b.* . . . In order that an act may be negligent it is necessary that the actor should realize that it involves a risk of causing harm to some interest of another, such as the interest in bodily security, which is protected against unintended invasion. But this of itself is not sufficient to make the act negligent. Not only must the act involve a risk which the actor realizes or should realize, but the risk which is realized or should be realized must be unreasonable."

In § 291, the Restatement of the Law, Torts, continues:

"(1) Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done."

■ It is our opinion that the risk here was not unreasonable. The act was useful and necessary. Jones was following the established custom for coupling similar vehicles. Lipes was his "mirror man," upon whom he was relying to effect the hookup. Jones and Lipes had commenced to couple the truck and trailer in accordance with standard good practice, viz.: to have the trailer wheels and tongue cramped ten to fifteen degrees to the right of its longitudinal axis and to back the truck down in line with the front wheels of the trailer. This procedure caused the truck to close with the trailer so that the rear surface of the truck body and the forward surface of the trailer body would form a horizontal "V" which would be closed at the right and open at the left-side. The *obvious advantages of this method* are that a person acting as Lipes did, may stand out to the left of the

trailer tongue, on the driver's side of the truck, and guide the truck driver by means of hand signals and then at the propitious moment, go in between the truck and trailer in the "open" or left side of the aperture between them and make the coupling. In the event that the truck driver should back too far, the man in the "open" side would be protected against crushing, for the right front of the trailer and the right rear of the truck would collide and prevent the truck from backing further.

It is equally obvious that one taking a position in the closed side of the "V" assumes a position of extreme danger. It must be remembered, however, that Jones did not know of anyone's presence in the recognized danger zone, and that, when the coupling operations were commenced, the decedent was not even in the immediate vicinity. Since the risk of someone voluntarily stepping into the "closed" side was relatively slight, Jones was entitled to proceed upon the assumption that other persons in the vicinity would exercise proper care for their own safety. Furthermore, by stationing Lipes between the vehicles, he had a right to rely upon him to warn anyone entering there of the danger involved, an obligation which Lipes fulfilled notwithstanding he had too little time in which to save the decedent from injury.

Since Lipes did not know that decedent would step into the "closed" side of the coupling, and had a right to expect that no one would do so, and since he did all he could to avert injury to deceased, he was not negligent. It is therefore unnecessary to pass upon appellant's contention that Lipes had, upon the basis of Jones' request for assistance, become the agent of the respondent.

A case similar to the case at bar is *Norton v. Connolly,* 218 Minn. 366, 16 N. W. (2d) 170, where the defendant's driver backed his trailer against a platform, disconnected it, then drove off in the truck for lunch. Meanwhile, some carpenters, including plaintiff's decedent, had moved the trailer ahead about three feet so that they would have room to repair the platform. While they were so engaged, the driver returned with the truck, and being unable to see

them because of certain obstructions, he backed the truck to couple to the trailer causing the trailer to crush the plaintiff's decedent against the platform. It was there held:

"These are the basic facts, which, in the interest of brevity, we have not elaborated upon. They amply sustain the verdict for the defendants upon the ground of want of negligence on Keough's [the driver] part, as well as upon the ground of contributory negligence on decedent's part."

Here, as in the *Norton* case, the evidence clearly shows that the respondent was not negligent and that the nonsuit was correctly granted.

"When the facts are neither contradicted nor permissive of conflicting inferences, when they are clearly settled and the course dictated by ordinary care can be so clearly discerned as to permit but a single inference, there is nothing proper for submission to a jury and the trial court should direct a verdict or a nonsuit." 1 Shearman & Redfield on Negligence 116, § 45.

In view of our decision that, as a matter of law, respondent was guilty of no negligence, it is not necessary to discuss whether the decedent was a mere volunteer or a licensee with an interest, or to consider the question of contributory negligence.

■ The appellant also assigned as error the denial of his motion at the close of his case for leave to amend the complaint to conform to the proof. This assignment was not argued in his brief, but since we have considered the proof and have found no negligence, the error, if it be one, is not prejudicial.

The judgment is affirmed.

BEALS, C. J., MILLARD, STEINERT, and SIMPSON, JJ., concur.